Daniel C. FANNING, Individually, and as Representative of a Class of Persons Similarly Situated

v.

THE UNITED STATES of America; United States Health Care Financing Administration; United States Department of Defense; United States Department of Health and Human Services; United States Department of the Army; United States Department of the Navy; United States Department of the Air Force; United States Indian Health Service; United States Department of Veterans Affairs; Michael McMullen, Mrs., as Acting Deputy Administrator of the United States Health Care Financing Administration; Donald H. Rumsfeld, as Secretary of Defense; Tommy G. Thompson, as Secretary of the Department of Health and Human Services; Gregory R. Dahlberg, the Honorable, as Acting Secretary of the Army; Robert B. Pirie, Jr., the Honorable, as Acting Secretary of the Navy; Lawrence Delaney, the Honorable Dr., as Secretary of the Air Force; Michael H. Trujillo, M.D., M.P.H., as Director of the Indian Health Service; Anthony J. Principi, the Honorable, as Secretary of the Department of Veterans Affairs; Robert E. Welsh, Jr., Esquire, as Administrator of the AcroMed Settlement Agreement; PNC Bank, N.A., as Trustee for the Acromed Settlement Agreement

United States of America, the Centers for Medicare and Medicaid Services (formerly the Health Care Financing Administration), the United States

Department of Health and Human Services, Tommy G. Thompson in his capacity as Secretary of the United States Department of Health and Human Services, and Thomas Scully in his capacity as Administrator of the Centers for Medicare and Medicaid Services (formerly Administrator of the Health Care Financing Administration), Appellants

No. 01–3366.

United States Court of Appeals, Third Circuit.

Argued June 10, 2002.

Opinion Filed: Oct. 10, 2003.

Robert D. McCallum, Jr., Esq., Assistant Attorney General, Patrick L. Meehan, Esq., United States Attorney, Mark B. Stern, Esq., Alisa B. Klein, Esq. (Argued), Attorneys, Appellate Staff, Department of Justice, Washington, D.C., for Appellants.

Arnold Levin, Esq., Michael D. Fishbein, Esq. (Argued), Zanetta Moore–Driggers, Esq., Levin, Fishbein, Sedran & Berman, Philadelphia, PA, for Appellee.

Robert E. Welsh, Jr., Esq., Welsh & Recker, Philadelphia, PA, As Administrator of the AcroMed Settlement Agreement.

Before: SLOVITER, ROTH, and McKEE, Circuit Judges.

## OPINION OF THE COURT

McKEE, Circuit Judge.

This litigation is the aftermath of an attempt by the Health Care Financing Administration ("HCFA") (now known as the Centers for Medicare and Medicaid Services ("CMS")), to obtain reimbursement under the Medicare as Secondary Payer statute, 42 U.S.C. § 1395y(b)(2). HCFA attempted to collect from a settlement trust fund for Medicare payments that had been made to AcroMed settlement class members for various medical expenses arising from injuries the settlement class members allegedly suffered as a result of the use of orthopedic bone screws manufactured by AcroMed. Daniel Fanning filed an amended complaint for declaratory and injunctive relief in an attempt to pre-vent the HCFA from obtaining Medicare reimbursement. Fanning filed the complaint on his own behalf and on behalf of the class in an attempt to prevent the HCFA from obtaining any of the proceeds of the settlement fund.[1]

The district court certified the class and granted preliminary relief enjoining the HCFA from attempting to obtain MSP reimbursement from the settlement trust fund. However, because we find that the district court did not have federal question jurisdiction, we will reverse and remand with instructions to dismiss the amended complaint.

## I. BACKGROUND

### A. THE MEDICARE AS SECONDARY PAYER STATUTE

Prior to 1980, Medicare generally paid for medical services whether or not the recipient was also covered by another health plan. See Social Security Amendments of 1965, Pub.L. No. 89–97, § 1862(b), 79 Stat. 286. However, beginning in 1980, Congress enacted a series of cost cutting amendments to the Medicare program. These amendments are collectively known as the Medicare as Secondary Payer ("MSP") statute or the MSP provisions. See New York Life Ins. Co. v. United States, 190 F.3d 1372, 1374 (Fed. Cir.1999).[2]

The MSP statute was designed to curb skyrocketing health costs and preserve the fiscal integrity of the Medicare system. See Zinman v. Shalala, 67 F.3d 841, 845 (9th Cir.1995); H.R.Rep. No. 96–1167, at 352 (1980). The MSP attempted to lower overall federal Medicare disbursements by

---

1. Fanning's amended complaint invoked the district court's federal question jurisdiction pursuant to 28 U.S.C. § 1331.

2. The amendments have been codified at 42 U.S.C. § 1395y(b).

requiring Medicare beneficiaries to exhaust all available insurance coverage before looking to Medicare's coverage. *See United States v. Rhode·Island Insurers' Insolvency Fund,* 80 F.3d 616, 618 (1st Cir.1996). The MSP assigns primary responsibility for medical bills of Medicare recipients to private health plans when a Medicare recipient is also covered by private insurance. These private plans are therefore considered "primary" under the MSP and Medicare acts as the "secondary" payer responsible only for paying amounts not covered by the primary plan.[3] *Blue Cross and Blue Shield of Texas v. Shalala,* 995 F.2d 70, 73 (5th Cir.1993).

Congress established two principal directives to achieve this objective. First, the MSP bars Medicare payments where "payment has already been made or can reasonably be expected to be made promptly (as determined in accordance with regulations)" by a primary plan. 42 U.S.C. § 1395y(b)(2)(A) (parenthetical in original). "Prompt" payment is defined in the applicable regulations as payment made within 120 days of either the date on which care was provided or when the claim was filed with the insurer, whichever is earlier. *See* 42 C.F.R. §§ 411.21, 411.50. The MSP defines a "primary plan" as "a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance[.]" 42 U.S.C.

§ 1395y(b)(2)(A)(ii) (parenthetical in original). This provision "is intended to keep the government from paying a medical bill where it is clear an insurance company will pay instead." *Evanston Hosp. v. Hauck,* 1 F.3d 540, 544 (7th Cir.1993) (citation omitted).

Second, the MSP provides that when Medicare makes a payment that a primary plan was responsible for, the payment is merely conditional and Medicare is entitled to reimbursement for it. 42 U.S.C. § 1395(y)(b)(2)(B); *Blue Cross and Blue Shield of Texas v. Shalala,* 995 F.2d 70, 73 (5th Cir.1993) (2002). Section 1395y(b)(2)(B) provides:

> Any payment under this subchapter with respect to any item or service to which subparagraph (A) applies shall be conditioned on reimbursement to the appropriate Trust Fund established by this subchapter when notice or other information is received that payment for such item or service has been or could be made under such subparagraph.

42 U.S.C. § 1395y(b)(2)(B)(i). Medicare payments are subject to reimbursement to the appropriate Medicare Trust Fund once the government receives notice that a third-party payment has been or could be made with respect to the same item or service.[4] *Id.*

## B. THE ACROMED LITIGATION

As noted above, the controversy surrounding the Medicare payments at issue

---

**3.** "Before 1980, if a Medicare beneficiary had an alternate source of payment, such as private insurance or an employee group health plan, Medicare was the primary payer, and the health plan was the secondary payer, liable only for the costs that remained after Medicare made its payments. Private insurers even wrote this practice into their health insurance contracts. Congress enacted the MSP statute to reverse the order of payment in cases where Medicare beneficiaries have an alternate source of payment for health

care." *Blue Cross and Blue Shield of Texas,* 995 F.2d at 73 (citations omitted).

**4.** If MSP reimbursement is not made, the MSP authorizes the government to bring an action against "any entity which is required or responsible . . . to make payment . . . under a primary plan" and against "any other entity (including a physician or provider) that has received payment from that entity." 42 U.S.C. § 1395y(b)(2)(B)(ii). The MSP also gives the government a separate right of subrogation. 42 U.S.C. § 1395y(b)(2)(iii).

here arose from a class action settlement of claims pertaining to orthopedic bone screws manufactured by AcroMed. AcroMed began marketing orthopedic bone screw devices for use in spinal fusion surgery in 1983. By the early part of the 1990s, thousands of individuals who had undergone spinal fusion surgery experienced complications and infirmities that they associated with AcroMed's bonescrews. A flood of product liability suits against AcroMed followed. *See In re Orthopedic Bone Screw Products Liability Litigation,* 176 F.R.D. 158, 165 (E.D.Pa. 1997). In 1994, the Judicial Panel on Multidistrict Litigation transferred all of the pending cases to the United States District Court for the Eastern District of Pennsylvania for pre-trial proceedings. *Id.* On January 8, 1997, Daniel Fanning, acting as a class representative, reached a settlement with AcroMed on behalf of the class. *Id.* Pursuant to the terms of that settlement, AcroMed transferred $100 million into a trust fund for distribution to class members who qualified for payment in accordance with a procedure to be established by the court.[5] *Id.* at 165–166.

Since members of the settlement class had previously received Medicare payments for medical expenses allegedly stemming from injuries caused by AcroMed's bone screws, the government filed a Statement of Interest in the district court after learning of the proposed AcroMed settlement. In that Statement of Interest, the government stated that, pursuant to the "secondary payer" provisions of the MSP, it intended to recover amounts Medicare had paid for the class members' medical care.

When efforts to settle the government claims broke down, the government sent letters to the approximately 1,800 members of the settlement class demanding repayment of the amounts Medicare had paid for medical treatment. The letters gave each class member 60 days to repay the amount set forth in each letter and warned that if the amount remained unpaid after 60 days, interest would accrue at the rate of 13.75% per annum until the debt was paid, regardless of whether a waiver of recovery request or administrative appeal was pending. The letters also told the class members that if they did not pay, Medicare could recover the outstanding balance from other federal benefits the individual plaintiff might otherwise be entitled to including additional Medicare payments, Social Security benefits and Railroad Retirement benefits. The letters similarly threatened that delinquencies would be reported to the Treasury Department for offset against any other federal payments the class members might otherwise receive. On March 21, 2001, Fanning filed an amended complaint alleging that payments from the AcroMed settlement are not the type of payments that give the government a right to reimbursement under the MSP. The amended complaint sought a permanent injunction barring the government from taking any action to enforce the rights asserted under the MSP. Concomitantly, Fanning filed a motion for a preliminary injunction and a motion for class certification.

The government responded with a motion to dismiss for lack of jurisdiction, arguing that 42 U.S.C. § 405(h) requires exhaustion of administrative remedies before claims that arise under the Medicare Act could be subjected to judicial review.[6]

---

**5.** In addition to the $100 million, AcroMed agreed to "assign the proceeds of virtually all of its insurance policies to the settlement fund." 176 F.R.D. at 166.

**6.** The government also opposed the motions for a preliminary injunction and for class certification.

The district court denied the government's motion to dismiss, certified the class and entered a preliminary injunction barring the government from taking any action to obtain reimbursement for Medicare payments from the class members. *In re Orthopedic Bone Screw Products Liability Litigation (Fanning v. United States)*, 202 F.R.D. 154 (E.D.Pa.2001). The court rejected the government's claim that the court lacked federal question jurisdiction under 42 U.S.C. § 405(h). The court found that § 405(h) did not apply to the settlement class members because they were not trying to recover Medicare benefits. Rather, in the court's view, the class members were attempting to enjoin collection of benefits the government had already paid. *Id.* at 170.

This appeal followed.

## II. DISCUSSION—FEDERAL QUESTION JURISDICTION

We have appellate jurisdiction over the district court's grant of preliminary injunctive relief pursuant to 28 U.S.C. § 1292(a)(1). However, the government renews its argument that the district court lacked jurisdiction because of the failure to exhaust administrative remedies. Therefore, before we can address the merits of the government's appeal, we must determine if the district court had jurisdiction over Fanning's amended class action complaint.[7]

It is obvious that when another insurer makes a payment for medical services Medicare has already paid for, a duplicate payment results. In the absence of reimbursement to Medicare, the duplicate payment is an overpayment of Medicare under the MSP. *See* 42 C.F.R. § 405.704(b)(13); *Buckner v. Heckler*, 804 F.2d 258, 259 (4th Cir.1986). As we have discussed, the MSP allows the Secretary to obtain reimbursement of the overpayment. 42 U.S.C. §§ 1395y(b)(2)(A)(ii), 1395y(b)(2)(B)(ii). However, a beneficiary who disagrees with the Secretary's determination that an overpayment of Medicare benefits has been made on his or her behalf is entitled to a hearing before the Secretary as provided in 42 U.S.C. § 405(b). *See* 42 U.S.C. § 1395ff(b)(1). If the beneficiary is dissatisfied with the Secretary's final decision after a hearing, the beneficiary is entitled to judicial review of that decision as provided in 42 U.S.C. § 405(g).[8] *See Id.*

7. A court of appeals has the obligation, not only to satisfy itself that it has appellate jurisdiction, but also to satisfy itself of the jurisdiction of the district court under review. *Dole v. Trinity Industries, Inc.*, 904 F.2d 867, 870 (3d Cir.1990). Our standard of review of the district court's determination that it had jurisdiction is plenary. *Id.*

8. 42 U.S.C. § 405(g) provides in relevant part:

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may al-

low.... As part of the Commissioner's answer the Commissioner ... shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.... The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil action. Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.

42 U.S.C. § 405(g).

■ The AcroMed settlement class members did not use the administrative procedure to challenge the government's efforts to obtain MSP reimbursement from the settlement trust fund. Instead, as noted above, Fanning filed an amended class action complaint pursuant to 28 U.S.C. § 1331 against various government defendants seeking class certification and injunctive relief to prevent the government from seeking reimbursement of the alleged Medicare overpayments. As noted, the government moved, *inter alia*, to dismiss the amended complaint for lack of jurisdiction; however, the district court denied the government's motion to dismiss.

The government's argument that the district court lacked jurisdiction is based on 42 U.S.C. § 405(h), a section of the Social Security Act that is made applicable to the Medicare Act by 42 U.S.C. § 1395ii.[9] Section 405(h), captioned "Finality of Commissioner's decision," reads:

> The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. *No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346* [federal defendant jurisdiction] *of Title 28 to recover on any claim arising under this subchapter.*

42 U.S.C. § 405(h) (emphasis added). The government contends that the district court lacked jurisdiction over Fanning's amended class action complaint because § 405(h) requires exhaustion of adminis-

trative remedies before claims that arise under the Medicare Act may be subject to judicial review. However, as is explained below, we believe that the technically correct argument is that § 405(h) bars federal question jurisdiction of Fanning's class action complaint and requires that the class members "must proceed instead through the special review channel that the Medicare statutes create." *Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 5, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000).

Section 405(h) contains three sentences, but it is the third sentence that is critical to our jurisdictional inquiry. It reads: "No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 [federal defendant jurisdiction] of Title 28 to recover on any claim arising under this subchapter." If Fanning's class action complaint asserts a claim that "aris[es] under" the Medicare Act, then the third sentence of § 405(h) precludes the district court from exercising federal question jurisdiction over it. Although the issue of whether a claim arises under a particular statute appears at first glance to require nothing more than a reading of the statute, our analysis of whether the class action complaint alleges a "claim arising under" the Medicare Act requires us to first examine four cases in which the Supreme Court discussed the operation and meaning of § 405(h) before relying solely on the "plain text" of the statute.

The first is *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). There, a deceased wage earner's widow and step-child challenged the Social Security Act's requirement of a nine-month long prior relationship with the deceased

---

9. The Medicare Act, 42 U.S.C. §§ 1395–1395zz, is Title XVIII of the Social Security Act. Section 1395ii of the Medicare Act makes § 405(h) applicable to the Medicare Act "to the same extent as" it applies to the Social Security Act.

wage earner as a condition of receiving survivor's benefits. Concetta Salfi married Londo Salfi on May 27, 1972. In spite of Londo's apparent good health, he suffered a heart attack less than a month later and died on November 21, 1972, less than six months after the marriage. His widow filed applications for mother's insurance benefits for herself and her daughter by a previous marriage. However, - the applications were denied by the Social Security Administration, both initially and on reconsideration at the regional level, solely on the basis of the Act's duration-of-relationship provisions.

The widow and other named plaintiffs then filed an action in the district court, "principally relying on 28 U.S.C. § 1331 for jurisdiction," challenging the duration-of-relationship provision on due process and equal protection grounds. 422 U.S. at 755, 95 S.Ct. 2457. The widow also sought to represent a class of all widows and stepchildren who had been denied benefits based solely on the Act's duration-of-relationship provisions. The widow and the named plaintiffs alleged partial exhaustion of their claims, but made no similar allegations with regard to the claims of other class members. On cross-motions for summary judgment, a three-judge district court panel held that the duration-of-relationship provision was unconstitutional, certified the class and enjoined the Social Security Administration from denying benefits on the basis of the duration-of-relationship provision.

On appeal, the Supreme Court ultimately concluded that the duration-of-relationship provision was constitutional. However, before it reached the merits, the Count noted that it was "confronted ... by a serious question as to whether the District Court had jurisdiction over th[e] suit." 422 U.S. at 756, 95 S.Ct. 2457. It is, of course, that jurisdictional discussion that is relevant to our inquiry.

The Court began its jurisdictional inquiry by noting that the third sentence of § 405(h) "[o]n its face, ... bars district court federal-question jurisdiction over suits, such as this one, which seek to recover Social Security benefits." *Id.* at 756–757, 95 S.Ct. 2457. Yet, the widow successfully invoked the district court's federal question § 1331 jurisdiction and the district court considered the third sentence "inapplicable because it amounted to no more than a codification of the doctrine of exhaustion of administrative remedies." *Id.* at 757, 95 S.Ct. 2457. Therefore, the district court found that exhaustion would be futile and waived the requirement. *See Salfi v. Weinberger,* 373 F.Supp. 961, 964 (N.D.Cal.1974).

However, the Supreme Court believed that the district court's conclusion that § 405(h) is simply an exhaustion requirement was "entirely too narrow" and held that the third sentence of § 405(h) is more than that. *Id.* at 757, 95 S.Ct. 2457. It wrote:

> That the third sentence of § 405(h) is more than a codified requirement of administrative exhaustion is plain from its own language, which is sweeping and direct and which states that no action shall be brought under § 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted. Moreover, if the third sentence is construed to be nothing more that a requirement of administrative exhaustion, it would be superfluous. This is because the first two sentences of § 405(h) ... assure that administrative exhaustion will be required. Specifically, they prevent review of decisions of the Secretary save as provided in the Act, which provision is made in § 405(g). This latter section

prescribes typical requirements for review of matters before an administrative agency, including administrative exhaustion. Thus the District Court's treatment of the third sentence of § 405(h) not only ignored that sentence's plain language, but also relegated it to a function which is already performed by other statutory provisions.

*Id.* at 757–758, 95 S.Ct. 2457. Although the Court made it abundantly clear that the third sentence of § 405(h) was something more than a mere exhaustion requirement, it did not fully define the reach of that language.

In any event, the Court next addressed a "somewhat more substantial argument" that the third sentence of § 405(h) did not deprive the district court of federal question jurisdiction. *Id.* at 760, 95 S.Ct. 2457. By its terms, the third sentence only concerns actions to recover "on any claim arising" under the Act. Not unexpectedly, the widow argued that her claim was not one arising under the Act, but was rather a claim under the constitution. *Id.* Therefore, the widow concluded, § 405(h) did not prevent the district court from having federal question jurisdiction over her complaint. However, the Court rejected that argument as well. It wrote:

> It would, of course, be fruitless to contend that ... the claim is one which does not arise under the Constitution, since [the widow's] constitutional arguments are critical to [her] complaint. But it is just as fruitless to argue that this action does not also arise under the Social Security Act. For not only is it Social Security benefits which appellees seek to recover, *but it is the Social Security Act which provides both the standing and the substantive basis for the presentation of their constitutional contentions.* Appellees sought, and the District Court granted, a judgment di-

recting the Secretary to pay Social Security benefits. To contend that such an action does not arise under the Act whose benefits are sought is to ignore both the language and substance of the complaint and judgment. This being so, the third sentence of § 405(h) precludes resort to federal-question jurisdiction for the adjudication of appellees' constitutional contentions.

*Id.* at 760–761, 95 S.Ct. 2457 (emphasis added). The Court also held that the operation of § 405(h) is not limited to "decisions of the Secretary on issues of law or fact." *Id.* at 762, 95 S.Ct. 2457. Rather, § 405(h) "extends to any 'action' seeking to recover on any (Social Security) claim'— *irrespective of whether resort to judicial processes is necessitated by discretionary decisions of the Secretary or by his non-discretionary application of allegedly unconstitutional statutory restrictions.*" *Id.* (emphasis added). Finally, insofar as constitutional challenges are concerned, the Court found that the Social Security Act "itself provides jurisdiction for constitutional challenges to its provisions." *Id.* Therefore, the Court held that "the plain words of the third sentence of § 405(h) do not preclude constitutional challenges."

> They simply require that they be brought under jurisdictional grants contained in the Act, and thus in conformity with the same standards which are applicable to nonconstitutional claims arising under the Act. The result is not only of unquestionable constitutionality, but it is also manifestly reasonable, since it assures the Secretary the opportunity prior to constitutional litigation to ascertain, for example, that the particular claims involved are neither invalid for other reasons nor allowable under other provisions of the Social Security Act.

*Id.* Accordingly, the Court held that § 405(h) barred the claims asserted under

the district court's federal question jurisdiction.[10]

The second case is *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), in which the Court reaffirmed *Weinberger v. Salfi* and extended its holding to the Medicare Act. There, four Medicare beneficiaries invoked the district court's federal question jurisdiction and brought an action challenging the Secretary's policy and ruling that no Medicare payments would be provided for a surgical procedure known as a bilateral carotid body resection ("BCBR"). They alleged that the policy and ruling violated the Medicare Act, the Administrative Procedure Act and the Due Process clause. *Id.* at 611 n. 7, 104 S.Ct. 2013. They sought declaratory and injunctive relief, including invalidation of the policy and ruling as well as an order enjoining the Secretary from applying it.

The district court dismissed their complaint for lack of jurisdiction. It held that, in essence, the plaintiffs were claiming an entitlement to benefits for the BCBR procedure and that any challenges to the Secretary's policy and ruling were "inextricably intertwined" with their claim for benefits. *Id.* at 611, 104 S.Ct. 2013. Therefore, the district court concluded that 405(g) with its exhaustion prerequisite provided the sole avenue for judicial review. Because none of the four plaintiffs had satisfied the exhaustion requirement, the district court dismissed their complaint. *Id.* at 612, 104 S.Ct. 2013.

The court of appeals reversed. It concluded that plaintiffs were actually arguing that the policy and ruling were "an unlawful administrative mechanism for determining the awards of benefits." *Id.* The

court reasoned that, to the extent that the plaintiffs sought to invalidate the Secretary's method for determining entitlement to benefits, the claim was a procedural one cognizable under § 1331 without any condition of exhaustion. *Id.* The court of appeals also agreed with the district court's conclusion that the plaintiffs had raised a substantive claim for benefits. However, while acknowledging that exhaustion was a prerequisite for a benefits claim under § 405(g), the court of appeals refused to dismiss the complaint based upon its belief that exhaustion would be futile.

The Supreme Court reversed the court of appeals. It agreed with the district court and the court of appeals that the claims were really for benefits, but rejected the court of appeals's attempt to separate the particular claims into procedural claims (i.e., challenges to the Secretary's method of rule making), and substantive claims (i.e., claims for benefits). Rather, in the Supreme Court's view, plaintiffs' procedural claim was "inextricably intertwined" with the substantive claim. *Id.* at 614, 104 S.Ct. 2013. Accordingly, the Court held that "all aspects of respondent's claim for benefits should be *channeled* first into the administrative process which Congress has provided for the determination of claims for benefits." *Id.* at 614, 104 S.Ct. 2013 (emphasis added). Its explained this "channeling" requirement as follows:

> The third sentence of 42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides that 405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue for judicial review for all "claims arising under" the Medicare Act. *See Weinberger v. Salfi*,

10. As noted, the widow alleged partial exhaustion of her claims, but made no such allegations as to the class members. For reasons not relevant to our discussion, the Court found that the widow and other named plaintiffs who alleged partial exhaustion could assert their claims in the district court under § 405(g). 422 U.S. at 767, 95 S.Ct. 2457.

422 U.S. at 760–761, 95 S.Ct. 2457. Thus, to be true to the language of the statute, the inquiry in determining whether § 405(h) bars federal-question jurisdiction must be whether the claim "arises under" the Act, not whether it lends itself to a "substantive" rather than a "procedural" label. *See Mathews v. Eldridge*, 424 U.S. [319] at 327, 96 S.Ct. 893, 47 L.Ed.2d 18 [1976] (recognizing that federal-question jurisdiction is barred by 42 U.S.C. § 405(h) even in a case where the claimant is challenging the administrative procedures used to terminate welfare benefits).

In *Weinberger v. Salfi*, 422 U.S. at 760–761, 95 S.Ct. 2457, we construed the "claim arising under" language quite broadly to include any claims in which "both the standing and the substantive basis for the presentation" of the claims is the Social Security Act. In that case we held that a constitutional challenge to the duration-of-relationship eligibility statute pursuant to which the claimant had been denied benefits, was a "claim arising under" Title II of the Social Security Act within the meaning of 42 U.S.C. § 405(h), even though we recognized that it was in one sense also a claim arising under the Constitution.

*Id.* at 614–615, 104 S.Ct. 2013. The Court concluded that under *Salfi*'s "broad test," the plaintiffs' claims were not cognizable under federal-question jurisdiction because the Medicare Act provided both the substance and standing for the claims. That is to say, the claims "arise under" the Medicare Act. *Id.* at 615, 104 S.Ct. 2013. Therefore, the third sentence of § 405(h) precluded the district court from having federal question jurisdiction. The only avenue for judicial review was § 405(g). *Id.* at 617, 104 S.Ct. 2013.

The third case relevant to the instant inquiry is *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), which appeared to limit the holdings of *Salfi* and *Ringer*. *Michigan Academy* involved a challenge by an association of family physicians to a Medicare regulation which authorized payment of Part B benefits in different amounts for similar services. The district court held that the regulation violated several provisions of the Medicare Act and found it invalid. Therefore, the court did not need to address the physicians' constitutional claims. On appeal, the court of appeals agreed that the regulation was inconsistent with the Act and, therefore, irrational and invalid. The court of appeals also declined to address the physicians' constitutional claims.

The Secretary did not challenge the decision on the merits on appeal to the Supreme Court. Rather, he renewed the jurisdictional argument that the district court and court of appeals had rejected. He claimed that §§ 1395ff and 1395ii (which, as noted, makes § 405(h) applicable to the Medicare Act) forbid judicial review under the district court's federal question jurisdiction of all questions affecting the amount of benefits payable under Part B of the Medicare program. At the time of the litigation in *Michigan Academy*, § 1395ff of the Medicare Act did not provide any administrative or judicial review of Part B benefit amount determinations. The scheme at that time was as follows: Under Part B, the Secretary contracted with private health insurance carriers to provide benefits, and the Medicare participants voluntarily payed a premium for those benefits. 476 U.S. at 674, 106 S.Ct. 2133. Although it was federally subsidized, Part B coverage was an option intended to supplement mandatory institutional health benefits such as coverage for hospital expenses covered by Part A. *Id.* at 674–675, 106 S.Ct. 2133. Individuals aggrieved by delayed or insufficient payment

with respect to Part B benefits were entitled to a hearing by the *private carrier*, subject to an amount-in-controversy requirement. In comparison, an aggrieved individual under Part A was entitled to a hearing by the Secretary and to judicial review, also subject to an amount-in-controversy requirement. *Id.* at 675, 106 S.Ct. 2133.

In deciding the case, the Court noted that the "strong presumption" in favor of judicial review of administrative action, *Id.* at 670, 106 S.Ct. 2133, can only be overcome by congressional intent evidenced by "specific language," *Id.* at 673, 106 S.Ct. 2133, or by "inferences of intent drawn from the statutory scheme as a whole." *Id.* at 673 n. 4, 106 S.Ct. 2133. Applying those principles, the Court found that the Act and its legislative history demonstrated a Congressional intention to "bar judicial review only of determinations of the amount of benefits to be awarded under Part B." *Id.* at 678, 106 S.Ct. 2133. As noted, Part B determinations were delegated to private insurance carriers. However, the Court concluded that "those matters which Congress did *not* leave to be determined in a 'fair hearing' conducted by the carrier—including challenges to the validity of the Secretary's instructions and regulations—are not impliedly insulated from judicial review by ... § 1395ff." [11] *Id.* (emphasis in original).

The Court also rejected the government's argument that the third sentence of § 405(h), as interpreted by *Salfi* and *Ringer*, barred federal question jurisdiction over the family physicians' challenge to the Secretary's regulation. It wrote:

> Section 405(h) does not apply on its own terms to Part B or the Medicare program, but is instead incorporated

*mutatis mutandis* by § 1395ii. The legislative history of both the statute establishing the Medicare program and the 1972 amendments thereto provides specific evidence of Congress' intent to foreclose review only of "amount determinations"—i.e., those "quite minor matters" remitted finally and exclusively to adjudication to private insurance carriers in a "fair hearing." By the same token, matters which Congress did *not* delegate to private carriers, such as challenges to the validity of the Secretary's instructions and regulations, are cognizable in courts of law.

*Id.* at 680, 106 S.Ct. 2133 (citations omitted)(emphasis in original). Accordingly, the Court held that § 405(h) did not prevent the district court from having federal question jurisdiction over the family physicians' complaint.

*Michigan Academy* created what came to be called the "amount/methodology" distinction, under which pre-enforcement challenges to the method by which Medicare benefits were determined, rather than challenges to the actual amount of the benefits, were not barred by § 405(h). *See* John Aloysius Cogan, Jr., and Rodney A. Johnson, *Administrative Channeling Under the Medicare Act Clarified: Illinois Council, Section 405(h), and the Application of Congressional Intent*, 9 Annals Health L. 125, 134 (2000). However, four months after *Michigan Academy*, Congress amended the Medicare Act to authorize administrative and judicial review of Part B claims meeting certain amount-in-controversy thresholds for services rendered on or after January 1, 1987. The amendment therefore effectively gave Part B claimants the same administrative and judicial remedies Part A claimants

---

11. The Court also noted that the Act's exhaustion requirement could not apply to the family physicians' challenge to the regulation be-

cause "there is no hearing, and thus no administrative remedy, to exhaust." 476 U.S. at 673 n. 4, 106 S.Ct. 2133.

had. *Id.* As a result of the amendment, most courts considered *Michigan Academy* a "dead letter," and the "amount/methodology" distinction was deemed to have been extinguished by Congress. *Id.* (citations omitted).

This set the stage for the final case bearing on our analysis, *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000). In *Illinois Council,* an association of nursing homes invoked the district court's federal question jurisdiction and sued the Secretary claiming that certain Medicare health and safety regulations violated various statutes as well as the Constitution. The district court dismissed the suit for lack of jurisdiction, holding that "a set of special statutory provisions creates a separate, virtually exclusive, system of administrative and judicial review of denials of Medicare claims; and it held that one of those provisions [§ 405(h)] explicitly barred a § 1331 suit." 529 U.S. at 5, 120 S.Ct. 1084.

However, the court of appeals reversed and gave new life to *Michigan Academy. Illinois Council on Long Term Care, Inc. v. Shalala,* 143 F.3d 1072 (7th Cir.1998). It found that *Michigan Academy* modified *Salfi* and *Ringer* by limiting their scope to amount determinations rather than pre-enforcement challenges. *Id.* at 1075–1076 ("As the Court read § 1395ii and therefore § 405(h) in *Michigan Academy,* pre-enforcement review of a regulation's validity is not an action to 'recover on' a claim, even when per *Salfi* a constitutional objection to the regulation is a 'claim arising under this subchapter.'").

The Supreme Court, however, reversed the court of appeals. The Court held, putting *Michigan Academy* aside for the moment, that § 405(h), as interpreted by *Salfi* and *Ringer,* "would clearly bar this section 1331 lawsuit." 529 U.S. at 11, 120 S.Ct. 1084. It wrote:

> Despite the urging of the Council and supporting *amici,* we cannot distinguish *Salfi* and *Ringer* from the case before us. Those cases themselves foreclose distinctions based upon the "potential future" versus the "actual present" nature of the claim, the "general legal" versus the "fact-specific" nature of the challenge, the "collateral" versus "non-collateral" nature of the issues, or the "declaratory" versus "injunctive" nature of the relief sought. Nor can we accept a distinction that limits the scope of § 405(h) to claims for monetary benefits. Claims for money, claims for other benefits, claims for program eligibility, and claims that contest a sanction or remedy may all similarly rest upon individual fact-related circumstances, may all similarly dispute agency policy determinations, or may all similarly involve the application, interpretation, or constitutionality of interrelated regulations or statutory provisions. There is no reason to distinguish among them in terms of the language or in terms of the purposes of § 405(h). Section 1395ii's blanket incorporation of that provision into the Medicare Act as a whole certainly contains no such distinction. Nor for similar reasons can we here limit those provisions to claims that involve "amounts."

*Id.* at 13–14, 120 S.Ct. 1084.

The Court also explained the rationale underlying § 405(h). At the outset, it conceded that "[t]he scope of the italicized language 'to recover on any claim arising under' the Social Security (or, as incorporated through § 1395ii, the Medicare) Act, is, if read alone, uncertain." *Id.* at 10, 120 S.Ct. 1084. Nonetheless, the Court held that the meaning and import of § 405(h) are clear in light of *Salfi* and *Ringer.* It explained:

[T]he bar of § 405(h) reaches beyond ordinary administrative law principles of "ripeness" and "exhaustion of administrative remedies"—doctrines that in any event normally require channeling a legal challenge through the agency.

Insofar as § 405(h) prevents application of the "ripeness" and "exhaustion" exceptions, i.e., insofar as it demands the *"channeling" of virtually all legal attacks* through the agency, it assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts applying "ripeness" and "exhaustion" exceptions case by case. But this assurance comes at a price, namely, occasional individual, delay-related hardship. In the context of a massive, complex health and safety program such as Medicare, embodied in hundreds of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any of several different courts, paying this price may seem justified. In any event, such was the judgment of Congress as understood in *Salfi* and *Ringer.*

*Id.* at 12–13, 120 S.Ct. 1084 (citations omitted) (emphasis added).

The Court then discussed whether *Michigan Academy* somehow modified *Salfi* and *Ringer.* The Court held that *Michigan Academy* did not modify *Salfi* and *Ringer* "by limiting the scope of [§ ] 1395ii and therefore § 405(h) to amount determinations." *Id.* at 15, 120 S.Ct. 1084 (internal quotations omitted). The Court noted that *Michigan Academy* involved a § 1331 challenge to regulations which, at

the time, were not administratively or judicially reviewable. Because no administrative or judicial review of the regulations was available, the Court in *Michigan Academy* allowed the family physicians to mount a challenge directly in a court of law under § 1331. Thus, the Court in *Illinois Council* seemed to read *Michigan Academy* as creating an exception to the channeling requirement of § 405(h) in those cases where no judicial review is available at all. *Id.* at 19, 120 S.Ct. 1084 ("[I]t is more plausible to read *Michigan Academy* as *holding* that § 1395ii does not apply § 405(h) where application of § 405(h) would not simply channel review through the agency, but would mean no review at all.") (emphasis in original).[12]

Our discussion of these four cases leads us back to the question of whether the district court had federal question jurisdiction over Fanning's amended class action complaint seeking to enjoin the government's attempt to obtain reimbursement of Medicare overpayments pursuant to the secondary payer provisions of the MSP. We believe that *Salfi, Ringer* and *Illinois Council* compel the conclusion that the district court had no federal question jurisdiction.

The essence of the claim asserted in Fanning's amended class action complaint is that the government is not entitled to recover Medicare overpayments from a fund created as a result of a settlement with an alleged tortfeasor because Congress never intended to treat a settlement trust fund as payments from a primary insurer under the MSP. We believe there may be force to Fanning's argument. However, the government's basis for seek-

---

12. In *Illinois Council,* the Court noted that § 405(h) "demands the 'channeling' of virtually all legal attacks through the agency." 529 U.S. at 13, 120 S.Ct. 1084. Since *Illinois Council* limited *Michigan Academy* to those instances were there was no review available at all, we assume that the Court's use of the phrase "virtually all legal attacks" is a specific reference to *Michigan Academy.*

ing MSP reimbursement from the AcroMed settlement trust fund is that AcroMed is a "self-insured plan" and is, therefore the primary payer under the MSP. Accordingly, the claim asserted in the amended class action complaint is wholly dependent upon determining whether or not AcroMed is a "self-insured plan" and, therefore, a "primary plan" under the MSP.[13] It is thus apparent that both the standing and the substantive basis for the claim asserted in the amended class action complaint are rooted in, and derived from, the Medicare Act. Consequently, the claim is one "arising under" the Medicare Act and the third sentence of § 405(h) therefore deprived the district court of federal question jurisdiction. The AcroMed class settlement plaintiffs are thus required by § 405(h), as interpreted by *Salfi, Ringer* and *Illinois Council,* to channel their claim through the agency.

Of course, the AcroMed class settlement plaintiffs would not have to channel their claim through the agency if they could avail themselves of the *Michigan Academy* exception. That is to say, channeling would not be required if they could show that they have no way of having their claims reviewed. To that end, they do claim that there is no administrative review of the agency's demand for MSP reimbursement. Therefore, they argue that a suit filed under the district court's federal question jurisdiction is the only avenue available to challenge the agency's reimbursement demand.

However, the class members' assertion of no administrative review of the agency's demand for MSP reimbursement is plainly wrong. The letters sent to the approximately 1,800 settlement class members clearly advised them of the administrative process by which they could appeal the agency's determination or, in the alternative, seek a waiver of Medicare's claim for reimbursement.[14] More importantly, the Medicare Manual sets out, at length, the "procedures to be used in processing appeals of MSP liability overpayment and waiver determinations." Medicare Inter-

---

**13.** As noted, the statutory definition of "primary plan" includes plans that are self-insured. 42 U.S.C. § 1395y(b)(2) ("the term 'primary plan' means ... a workmen's compensation law or plan, an automobile or liability policy or plan (including a self-insured plan) or no fault insurance."). Under the regulations, a "plan" is defined as "any arrangement, oral or written, by one or more entities, to provide health benefits or medical care or assume legal liability for injury or illness." 42 C.F.R. § 411.21. The term "self-insured plan" is defined as a "plan under which an individual, or a private or governmental entity, carries its own risk instead of taking out insurance with a carrier." 42 C.F.R. § 411.50(b)(2). A "self-insured plan" includes an "entity engaged in a business, trade or profession." *Id.*

Although it has no bearing on our decision, we note that the government's argument that a "self-insured plan" includes a fund created by a tortfeasor to settle litigation has engendered a circuit split. The Fifth Circuit, in

*Thompson v. Goetzmann,* 315 F.3d 457, 470 & n. 65 (5th Cir.2002), *opinion withdrawn and reissued as amended on other grounds,* 337 F.3d 489 (5th Cir.2003), rejected the government's argument, while the Eleventh Circuit, in *United States v. Baxter Intern., Inc.,* 345 F.3d 866, 2003 WL 22120071 (11th Cir. Sept.15, 2003), accepted it.

**14.** The Medicare beneficiary may ask the Secretary to waive recovery in full or in part. The Secretary may waive recovery when the beneficiary was not at fault and recovery would defeat the purposes of the Medicare Act or be against equity or good conscience. *See* 42 U.S.C. § 1395gg(c). The regulations explain that the purposes of the Medicare Act would be defeated if recovery would deprive a person of income required for ordinary and necessary living expenses, including medical expenses. *See* 42 C.F.R. § 405.358; 20 C.F.R. § 404.508(a). The Secretary's waiver determination is subject to administrative and judicial review. *See* 42 U.S.C. § 1395ff(b)(1); 42 C.F.R. §§ 405.704(b)(14), 405.720–730.

mediary Manual, Part 3, § 3419.[15] Therefore, the *Michigan Academy* exception is not available to the AcroMed settlement class members.

In a further attempt to establish jurisdiction, the AcroMed class settlement members argue that § 405(h) does not apply because their complaint seeks neither a benefit determination nor a review of benefit determinations, but is instead a challenge to the right of Medicare to seek reimbursement of alleged overpayments from a trust fund created as a result of a settlement with a tortfeasor. We agree with that characterization of the class members' claim. However, under *Salfi, Ringer* and *Illinois Council,* that distinction is irrelevant. The appropriate inquiry

is whether the Medicare Act provides both the standing and the substantive basis for their contentions. Clearly it does, because the dispositive issue is whether AcroMed is a "self-insured plan" within the meaning of the MSP.[16]

██ The AcroMed class settlement plaintiffs next argue that the agency's demand letters to them is final agency action from which they can seek judicial review. However, that argument is without merit. The demand letters, although harsh in their terms and probably unsettling to their recipients, advised the class settlement plaintiffs of their administrative review rights. Therefore, it is difficult to define them as final, rather than initial, agency action.[17] Moreover, even if we as-

---

**15.** The pertinent Manual provisions are available at http://cms.hhs.gov/manuals/13_int/a3toc.asp.

**16.** Moreover, we note, but do not decide, that a reasonable argument can be made that the AcroMed class settlement members are in fact seeking benefits. As the government says: "[P]laintiffs do seek benefits: they are effectively seeking to require that Medicare make primary, rather than secondary, payment for medical expenses related to their settlement with AcroMed." Government's Br. at 25. In addition, one court of appeals has held that a Medicare beneficiary's "claim that she is entitled to the overpayment is, in essence, one for medicare benefits." *Buckner v. Heckler,* 804 F.2d 258, 260 (4th Cir.1986).

**17.** We are not unsympathetic to the class settlement counsel's consternation over the wording of the 1800 letters the government sent out. Counsel claims that the language of the letters was intended more to terrify than to inform, and that, to the extent they may have served to inform, they succeeded only in misinforming large numbers of the class because the amounts stated in the letters were frequently erroneous. Although there has been no finding about the accuracy of the amounts the government requested in those letters, we agree that the wording of the letters was unnecessarily callous and threatening. A typical example of one of these letters read as follows:

You must pay this amount (**$11,833.44**) within sixty (60) days of the date of this letter (by **July 9, 2001**). Please send a check or money order . . . .

If you do not pay this amount by **July 9, 2001**, you will be required to pay interest from the date of this letter. Interest will be calculated at the rate of **13.75%** per annum in accordance with 42 C.F.R. 411.24(m). Interest will continue to accrue until the debt is paid, whether or not a waiver of recovery request or appeal is pending.

If you do not pay this amount, the Medicare program may recover the amount from any Social Security or Railroad Retirement benefits to which you might otherwise be entitled, or the money may be recouped from payments Medicare would otherwise pay you. Also, please be aware that Medicare must refer delinquent debts to the Department of Treasury for offset against Federal payments that may be due or for other appropriate collection actions.

JA 98 (emphasis in original).

Although this language did inform class members, it no doubt did much more; it had to have coerced and frightened them as well. In fact, the coercive nature of this letter explains why one court referred to the government's "heavy-handed collection" tactics under the MSP. *In Re Dow Corning Corp.,* 250 B.R. 298, 336 (Bankr.E.D.Mich.2000). *See also Waters v. Farmers Texas County Mut. Ins. Co.,* 9 F.3d 397, 400–01 (5th Cir.1993) (ex-

sume *arguendo* that the letter was final agency action, judicial review of that final action is available only through § 405(g). Under the Medicare Act, there is no judicial review of final agency action under the district court's federal question jurisdiction.[18] *Ringer*, 466 U.S. at 614–615, 104 S.Ct. 2013 ("The third sentence of 42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides that § 405(g), to the exclusion of 28 U.S.C. § 1331, is the *sole avenue for judicial review* for all 'claim[s] arising under' the Medicare Act.") (emphasis added).

## III.  CONCLUSION

Thus, for the reasons set forth above, we find the AcroMed settlement class plaintiffs' claim that the government cannot seek MSP reimbursement from the settlement trust fund established by AcroMed is a "claim arising under" the Medicare Act. Therefore, Section 405(h) of the Social Security Act, made applicable to the Medicare Act by 42 U.S.C. § 1395ii, precluded the district court from having federal question jurisdiction over Fanning's amended class action complaint. Consequently, we will reverse the district court and remand with instruction to dismiss the amended class action complaint.

pressing disappointment with "the government's overreaching interpretation of its authority under the [MSP].").

*Although counsel for appellees here engages in some hyperbole in referring to the government's actions as "the apogee of a heavy-handed, coercive, neo-Stalinist approach," counsel's outrage over the threatening tone of the letters is not totally unjustified. See* Appellee's Br. at 27. Although we would not go so far as to agree that these letters were "neo-Stalinist" tactics, they are more suggestive of tactics one might attribute to a

less than reputable collection agency rather than to one's own government.

18. The AcroMed settlement class plaintiffs also argue that the district court had jurisdiction to review final agency action under the judicial review provision of the Administrative Procedure Act, 5 U.S.C. § 706. However, that "provision is not an independent grant of subject-matter jurisdiction." *Your Home Visiting Nurse Services, Inc. v. Shalala*, 525 U.S. 449, 457–58, 119 S.Ct. 930, 142 L.Ed.2d 919 (1999) (citing *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980 (1977)).