OPINION

No. 04-03-00816-CV

RENCARE, LTD.,
Appellant

v.

UNITED MEDICAL RESOURCES, INC., IASIS Healthcare Corporation,
and Southwest General Hospital, L.P.,
Appellees

From the 38th Judicial District Court, Medina County, Texas
Trial Court No. 02-07-16068-CV
Honorable Mickey R. Pennington, Judge Presiding
 
Opinion by:    Sarah B. Duncan, Justice
 
Sitting:            Catherine Stone, Justice
Sarah B. Duncan, Justice
Karen Angelini, Justice
 
Delivered and Filed:   May 18, 2005

REVERSED AND REMANDED
            RenCare, Ltd. appeals the judgment dismissing its tort claims against Southwest General
Hospital, L.P.; Southwest’s parent and operator, IASIS Healthcare Corporation; and United Medical
Resources, Inc. for lack of subject matter jurisdiction. We hold the trial court possessed subject
matter jurisdiction over RenCare’s claims because they do not “arise under” the Medicare Act. We
therefore reverse the trial court’s judgment and remand the cause for further proceedings consistent
with this opinion.
Factual and Procedural Background
            RenCare provides out-patient dialysis treatment to individuals suffering from end-stage renal
disease (ESRD), more commonly known as kidney failure. Among the individuals RenCare serves
is an employee of Southwest General Hospital, L.P., which is owned and operated by IASIS
Healthcare Corporation. To protect the privacy of this patient (who is not a party to this appeal), the
parties agreed to refer to the patient as “Patient Doe” in all documents that are filed with a court and
thus accessible to the public. We will do likewise in this opinion.
            As one of Southwest’s employees, Patient Doe is a beneficiary of Southwest’s self-funded
group health care plan (the Plan). In 2002 administration of the Plan was transferred to United
Medical Resources (UMR). Henceforth in this opinion, we will refer to Southwest General Hospital,
IASIS Healthcare Corporation, and United Medical Resources collectively as “Southwest.”
Sometime after the transfer to UMR, RenCare “communicated with [Southwest] to verify insurance
coverage before accepting Patient Doe for continued dialysis treatments.” According to RenCare,
Southwest “represented that there was full primary coverage for Patient Doe’s dialysis treatments
without limitations and gave an unrestricted authorization number.” Accordingly, “RenCare
undertook the care and provided dialysis to Patient Doe.” Some months later, however, when
RenCare submitted its first group of invoices, Southwest refused to pay. After repeated demands
failed to yield payment, in July 2002, RenCare filed this suit against Southwest for fraud and
misrepresentation. RenCare seeks to recover the amount of its invoices through the date of trial,
exemplary damages, attorney’s fees, and costs. 
            After RenCare filed suit, Southwest – for the first time – contended that the Plan was
secondary to Medicare, which was the primary payer.


 Thereafter, at Southwest’s request, RenCare
submitted its invoices to Medicare through its fiscal agent, Trailblazer Health Enterprises, L.L.C.



Trailblazer rejected RenCare’s claim, stating as follows:
The intermediary’s records indicate that this beneficiary has coverage through a large
group health plan that is primary over Medicare. Therefore, we are rejecting this
claim. Please bill the primary insurer and submit a [Medicare as Second Payer] bill
to Medicare upon receipt of the primary payment.
In keeping with this determination, Medicare thereafter determined its responsibility for Patient
Doe’s dialysis in 2002 to be zero. In short, RenCare was told by Medicare that the Plan was the
primary payer but was told by the Plan that Medicare was primary; thus neither would pay RenCare’s
invoices. 
            According to UMR’s corporate representative, Deana Combs, UMR contacted Medicare
several times to obtain an explanation for Medicare’s rejection of RenCare’s claim; but “Medicare
... refuse[d] to provide this information to UMR.” Also according to Combs, another of UMR’s
employees, Peggy Olson, on June 20, 2002 “had a telephone conversation with ‘Marian’ of
Medicare”; during this conversation, “Marian acknowledged that Medicare was the primary insurer
of Patient Doe’s ESRD treatment.”


 However, Combs admitted during her deposition that UMR is
unable to produce any written documentation from Medicare indicating that it was the primary payer
for Patient Doe’s 2002 dialysis, nor is UMR able to produce written confirmation from Medicare of
the telephone conversation between Olson and “Marian of Medicare.” 
            After discovery, Southwest moved to dismiss RenCare’s suit on the ground that the trial court
lacked subject matter jurisdiction over RenCare’s claims, because they are for Medicare benefits or
“inextricably intertwined” with Medicare benefits; accordingly, RenCare was required to exhaust
its administrative remedies. Because RenCare failed to do so, the trial court lacked subject matter
jurisdiction. The trial court agreed, ruling that RenCare’s “claim is inextricably intertwined with [its]
claim for Medicare benefits” and therefore barred by the Medicare Act. The trial court also ruled
“that Medicare was the primary insurer for [Patient Doe’s] dialysis treatments during calendar [year]
2002.” The court thus dismissed RenCare’s suit for lack of subject matter jurisdiction. RenCare
appealed.
Standard and Scope of Review
            “Statutory construction is a question of law that we review de novo.” In re Forlenza, 140
S.W.3d 373, 376 (Tex. 2004). Likewise, “[w]hether a court has subject matter jurisdiction is a
question of law.” Texas Dep’t. of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004).
In deciding whether the trial court had jurisdiction, we are “not required to look solely to the
pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional
issues raised.” Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 555 (Tex. 2000).
“Arises Under”
            In its first issue, RenCare argues the trial court erred in ruling that RenCare’s claims are
“inextricably intertwined” with a claim for Medicare benefits and thus “arise under” the Medicare
Act. This issue is dispositive of RenCare’s appeal because if its claims “arise under” the Medicare
Act, RenCare must exhaust its administrative remedies before it may file suit. Conversely, if
RenCare’s claims do not “arise under” the Medicare Act, it was not required to exhaust its
administrative remedies before filing suit.
Applicable Law
            “42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides
that § 405(g) is the sole avenue for judicial review of all ‘claims arising under’ the Medicare Act.”
RenCare, Ltd. v. Humana Health Plan of Texas, Inc., 395 F.3d 555, 557 (5th Cir. 2004). Section
405(g) provides in part as follows:
Any individual, after any final decision of the Secretary [of Health and Human
Services] made after a hearing to which he was a party, irrespective of the amount in
controversy, may obtain review of such decision by a civil action commenced within
sixty days after the mailing to him of notice of such decision or within such further
time as the Secretary may allow.

 42 U.S.C. § 405(g) (emphasis added); 42 U.S.C. § 1395ff(b)(1)(A). “[T]he Secretary has provided
that a ‘final decision’ is rendered on a Medicare claim only after the individual claimant has pressed
his claim through all designated levels of administrative review.” Heckler v. Ringer, 466 U.S. 602,
606, 104 S.Ct. 2013, 2017, 80 L.Ed.2d 622 (1984). Accordingly, if a claim “arises under” the
Medicare Act, the claimant must exhaust its administrative remedies before it may seek judicial
review. See id. 466 U.S. at 622. If the claimant fails to do so, the district court lacks subject matter
jurisdiction over the claim. See id.
            Claims “arise under” the Medicare Act if “‘both the standing and the substantive basis for
the presentation’ of the claims’” is the Medicare Act. Id. at 615 (quoting Weinberger v. Salfi, 422
U.S. 749, 760-61, 95 S.Ct. 2457, 2464-65, 45 L.Ed.2d 522 (1975)). If a claim is “based on state law,
the standing and substantive basis for [the] claim[] is clearly not the Medicare Act.” RenCare, 395
F.3d at 557. Since state law forms the basis of all of RenCare’s claims in this case, Southwest admits
the first test does not apply. Southwest instead relies upon the second test for whether a claim “arises
under” the Medicare Act: if the claim is “inextricably intertwined with what ... is in essence a claim
for [Medicare] benefits.” Ringer, 466 U.S. at 624. 
            “Inextricable” means “incapable of being disentangled or untied,” while “intertwined” means
“to unite by twining with one another.” Webster’s Ninth New Collegiate Dictionary 618, 633
(Merriam-Webster, Inc. 1990). The Eighth Circuit Court of Appeals has thus held that a claim is
“inextricably intertwined” with a claim for Medicare benefits and therefore “jurisdictionally barred”
if resolving the claim “would necessarily mean redeciding” Medicare’s claim decision. Midland
Psychiatric Assocs., Inc. v. United States, 145 F.3d 1000, 1004 (8th Cir. 1998). 
            In Midland Psychiatric, Midland Psychiatric Associates entered into contracts with two
hospitals to provide nursing-home residents with partial hospitalization services, which are covered
under Part B of the Medicare Act. Midland Psychiatric Assocs., 145 F.3d at 1001. “Midland billed
the hospitals, and the hospitals in turn submitted Medicare claims for Midland’s services to Mutual,
a Medicare [fiscal agent].” Id. at 1002. However, “Mutual denied thousands of the hospitals’
Midland-related claims,” with the result that “the hospitals eventually dropped Midland’s services,
and several hospitals thinking of contracting with Midland decided against it.” Id. Ultimately,
Midland filed suit “against Mutual and the United States, claiming Mutual had tortiously interfered
with Midland’s past and prospective hospital contracts and the Government had supervised Mutual
negligently.” Id.
            To determine whether Midland’s tortious interference claim was “inextricably intertwined”
with a claim for Medicare benefits and thus preempted by the Medicare Act, the Eighth Circuit, like
the district court, began its analysis with the applicable state law governing tortious interference
claims. Id. “Under that law, Midland would have to prove, among other elements, that Mutual
interfered with Midland’s hospital contracts without justification.” Id. Since “Mutual cannot be held
liable for tortious interference if it had a right to deny the hospitals’ claims,” “[t]he district court ...
correctly concluded that hearing Midland’s tortious interference claim against Mutual would mean
reviewing the merits of Mutual’s Medicare claims decisions” and that “42 U.S.C. § 405(h) deprived
it of the power to conduct such a review.” Id.; see also id. at 1004. Accordingly, the court held,
Midland’s claim arose under the Medicare Act and was jurisdictionally barred. Id.; cf. Affiliated
Prof’l Home Health Care Agency v. Shalala, 164 F.3d 282, 285 (5th Cir. 1999) (noting that “to fully
address [the plaintiff health care agency’s] claim that their due process and equal protection rights
were violated through the improper enforcement of Medicare regulations, a court would necessarily
have to immerse itself in those regulations and make a factual determination as to whether [the
plaintiff health care agency] was actually in compliance”).
Discussion
            To prevail on its fraud and intentional misrepresentation claims, RenCare must establish four
elements: (1) Southwest made a material representation that was false; (2) Southwest knew the
representation was false or made it recklessly as a positive assertion without any knowledge of its
truth; (3) Southwest intended to induce RenCare to act upon the representation; and (4) RenCare
actually and justifiably relied upon the representation and thereby suffered injury. See Ernst &
Young, L.L.P. v. Pacific Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001) (stating elements of
fraud claim); see also Smith v. Tilton, 3 S.W.3d 77, 88 (Tex. App.–Dallas 1999, no pet.) (holding
appellant’s claim for intentional misrepresentation was the same as her fraud claim). To recover on
its negligent misrepresentation claim, RenCare must also establish four elements: (1) Southwest
supplied RenCare with “false information” for RenCare’s guidance in its business; (2) Southwest
supplied this false information in the course of its business, or in a transaction in which it had a
pecuniary interest; (3) Southwest did not exercise reasonable care or competence in obtaining or
communicating the information; and (4) RenCare suffered pecuniary loss by justifiably relying on
the representation. See Federal Land Bank Ass’n of Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex.
1991).
            As noted above, RenCare alleges Southwest misrepresented that there was “full primary
coverage for Patient Doe’s dialysis treatments without limitations”; RenCare relied upon
Southwest’s representation and provided Patient Doe with dialysis treatments; Southwest’s
representation was false; and RenCare suffered damages in the amount of its invoices, attorney’s
fees, and costs. We do not, of course, address whether RenCare’s allegations can be proved. We
reiterate the allegations here for the sole purpose of demonstrating that RenCare’s claims, unlike
Midland’s tortious interference claim, would not “necessarily mean redeciding” Medicare’s claim
decision. See Midland, 145 F.3d at 1002, 1004.
            In support of the trial court’s ruling, Southwest argues that the Supreme Court in Ringer
“explicitly held that regardless of how a plaintiff attempts to characterize its claim, it is inextricably
intertwined with a claim for Medicare benefits if, ‘at bottom’, it is a claim for expenses reimbursable
under the Medicare Act.” But this is incorrect. To understand what the Court did say, it is necessary
to understand that the plaintiffs in Ringer were individual Medicare claimants, who filed suit against
the Secretary of Health and Human Services to challenge her policy that Medicare would not provide
benefits for bilateral carotid body resection. Ringer, 466 U.S. at 604-05. The claimants’ complaint
sought “a declaration that the Secretary’s refusal to find that [the] surgery is ‘reasonable and
necessary’ under the Act is unlawful, an injunction compelling the Secretary to instruct her
intermediaries to provide payment for [claims for the surgery], and an injunction barring the
Secretary from forcing claimants to pursue individual administrative appeals in order to obtain
payment.” Id. at 611. It is in this context that the Court states: “It seems to us that it makes no sense
to construe the claims of those three respondents [who had already had the surgery] as anything more
than, at bottom, a claim that they should be paid for [the surgery].” Id. at 614. Read in context, this
statement in Ringer states simply that a Medicare enrollee’s claim for reimbursement from Medicare
states a claim that “arises under” the Medicare Act. This statement thus does not support the trial
court’s ruling here since RenCare, unlike the Ringer claimants, is not an individual Medicare
claimant, it has not sued the Secretary, and it does not seek reimbursement from Medicare for a
claim that has been determined to be outside the Medicare Act’s coverage.
            Southwest cites three additional cases to support the trial court’s ruling: Foley v. Southwest
Texas HMO, Inc., 226 F.Supp.2d 886, 890 (E.D. Tex. 2002); Lifecare Hosps., Inc. v. Ochsner Health
Plan, Inc., 139 F.Supp. 2d 768 (W.D. La. 2001); and RenCare, Ltd. v. Humana Health Plan of
Texas, Inc., No. SA-02-CA–1157-RF (W.D. Tex. Mar. 25, 2003), rev’d, 395 F.3d 555 (5th Cir.
2004). None of these, ultimately, persuade us of Southwest’s position.
            In RenCare, RenCare sued Humana to recover for kidney dialysis services “Humana
approved of, and RenCare provided” to “Humana’s enrollees, including its M+C enrollees.”
RenCare, 395 F.3d at 557, 558. M+C stands for “Medicare + Choice” (now called Medicare
Advantage), under Medicare Part C,“which provides medical benefits to its enrollees through a range
of coverage plans ... and is administered by private, managed health care organizations.” Id. at 556.
“M+C organizations receive fixed monthly payments from [the Center for Medicare and Medicaid
Services, a division of the United States Department of Health and Human Services]” “regardless
of the value of services the patient actually receives.” Id. at 556-57. The district court initially
retained jurisdiction over and subsequently dismissed RenCare’s claims relating to the M+C
enrollees because “RenCare failed to exhaust its administrative remedies under the Medicare Act.”
Id. at 557. Indeed, the district court ruled in Humana’s favor in reliance upon the same misquotation
from Ringer and the same cases cited by Southwest in this case:
[U]nder Foley and Lifecare, the existence of a contractual relationship between
[RenCare] and [Humana] is irrelevant if [RenCare’s] claims are, at bottom, claims
for benefits under Medicare. Since the contract in this case, to the extent it pertains
to Medicare enrollees, ultimately concerns services reimbursable by Medicare, the
Court holds that these claims arise under the Medicare Act.

RenCare, Ltd. v. Humana Health Plan of Texas, Inc., No. SA-02-CA-1157-RF, at 2 (W.D. Tex. Mar.
25, 2003) (emphasis added).The Fifth Circuit reversed, agreeing with RenCare “that its claims do
not arise under federal law and thus are not subject to federal jurisdiction or federal administrative
remedies.” RenCare, 395 F.3d at 557. In support of its decision, the Fifth Circuit contrasted the
situation presented to it in RenCare with the situation presented to the Supreme Court in Ringer as
follows:
Here, Medicare beneficiaries were not denied services or reimbursement for services.
To the contrary, Humana approved of, and RenCare provided, the kidney dialysis
services for which RenCare seeks payment. Because RenCare has waived its right to
payment from enrollees in its contract with Humana, Humana’s M+C enrollees are
not at risk of being billed for the services that RenCare provided them. Thus, unlike
the situation in Ringer, there are no enrollees seeking Medicare benefits.
Furthermore, while the government had an interest in the outcome of the Ringer
litigation, the government has no financial interest in the present case because it pays
Humana a flat rate each month for Humana’s services to M+C enrollees, regardless
of the services it renders to M+C beneficiaries. Irrespective of who ultimately
prevails, the government will not receive or pay out funds. The dispute is solely
between Humana and RenCare and is based on the parties privately-agreed-to
payment plan.

Id. at 558. So it is here: Patient Doe has not been denied services or reimbursement for services;
rather, Southwest – like Humana – approved of, and RenCare provided, the kidney dialysis
treatments that underlie RenCare’s claims; RenCare has not sought payment for its services from
Patient Doe; and, since Medicare’s fiscal agent has determined Medicare’s liability for Patient Doe’s
2002 dialysis treatments to be zero, regardless of who prevails in this lawsuit, “the government will
not receive or pay out funds.” 
            Another factor the Fifth Circuit found significant in RenCare was that, under Part C of the
Medicare Act, “Humana’s failure to pay RenCare is not an organization determination that RenCare
could appeal within the mandatory administrative review mechanism.” Id. at 560. The court thus
concluded that RenCare had “no administrative remedies ... to exhaust ....” Id. So it is here. It does
not appear that RenCare is entitled to participate in the administrative review process provided by
42 U.S.C. § 1395ff(b)(1)(A), because it is not an “individual” who even had a basis for being
“dissatisfied” with Trailblazer’s initial determination that Medicare was the secondary payer and the
Plan the primary payer for Patient Doe’s dialysis treatments. See 42 U.S.C. § 1395ff(b)(1)(A)
(providing a mechanism by which “any individual dissatisfied” with an initial determination may
obtain a redetermination by the fiscal agent as the first step in the administrative review process).



            Nor does it appear that RenCare could avail itself of the review provided by 42 U.S.C.
§ 1395oo, since the Provider Reimbursement Review Board provided by that section does not have
jurisdiction over “coverage” decisions. See 42 U.S.C. § 1395oo(g)(1) (“The finding of a fiscal
intermediary that no payment may be made under this subchapter for any expenses incurred for items
or services furnished to an individual because such items or services are listed in section 1395y of
this title shall not be reviewed by the Board, or by any court pursuant to an action brought under
subsection (f) of this section.”); see also, e.g., Curators, Univ. of Mo. v. Sullivan, 963 F.2d 220, 221-22 (8th Cir. 1992) (“It is clear from the analysis in Highland [Dist. Hosp. v. Sec’y of Health &
Human Servs., 676 F.2d 230 (6th Cir. 1982)] and our own reading of § 1395oo that the PRRB has
no discretion to hear coverage claims.”), cert. denied, 506 U.S. 953 (1992).
            The Fifth Circuit’s decision in RenCare was recently discussed by the Fourteenth Court of
Appeals in Christus Health Gulf Coast v. Aetna, Inc., No. 14-03-01281-CV, 2005 WL 851187, at
___ n. 10 (Tex. App.–Houston [14th Dist.] April 14, 2005, no pet. h.). In Christus, the third-party
administrator “became insolvent and never responded to approximately 6,000 claims from the
[plaintiff] Hospitals totaling over $13 million.” Id. at ___. The Fourteenth Court of Appeals held that
“the Hospitals’ claims arise under the Medicare Act”; therefore, “the trial court did not have subject
matter jurisdiction over the Hospitals’ claims.” Id. at ___. In doing so, the court agreed with the
analysis in the two remaining cases cited by Southwest – Foley and Lifecare – and distinguished the
Fifth Circuit’s decision in RenCare as involving a “pure payment dispute,” while the case before the
court involved at least “[t]he potential of a coverage dispute” since a coverage determination had
never been made. Id. at ___ n.10. We also note, as RenCare does, that the defendants in Foley and
Lifecare were managed care entities that served as Medicare’s fiscal agents and were thus authorized
to make the initial decisions on Medicare claims.


 Southwest, on the other hand, is not a fiscal
intermediary.
            We conclude, as the Fifth Circuit did in RenCare, that “RenCare’s claims are not intertwined,
much less ‘inextricably intertwined,’ with a claim for Medicare benefits. At bottom, RenCare’s
claims are claims for payment pursuant to a contract between private parties.” Rencare, 395 F.3d at
559. In short, as in RenCare, the dispute is a private one between RenCare and Southwest and based
on Southwest’s alleged misrepresentation. Cf. Transitional Hosps. Corp. v. Blue Cross & Blue Shield
of Texas, Inc., 164 F.3d 952, 955 (5th Cir. 1999) (holding that plaintiff’s claim that defendant
negligently misrepresented coverage under ERISA plan not preempted because “not dependent on
or derived from [employee’s] right to recover benefits under the ... plan”; but plaintiff’s contract
claim was preempted). We therefore hold RenCare’s tort claims do not “arise under” the Medicare
Act. Consequently, RenCare was not required to exhaust its administrative remedies (if it had any)
before filing suit. The trial court therefore erred in dismissing RenCare’s claims.
Medicare as Secondary Payer
            In its second issue, RenCare argues the trial court erred in ruling that Medicare is the primary
payer for Patient Doe’s ESRD, while Southwest argues that “federal law is abundantly clear that
Medicare, rather than the Plan, is the primary insurer for Patient Doe’s ESRD treatment.” Although
resolving this dispute is not necessary to our disposition of RenCare’s appeal, we have decided
nonetheless to address it, if only to lessen the parties’ confusion regarding Trailblazer’s statement
that the Plan – not Medicare – is the primary payer for Patient Doe’s dialysis treatment.
            Southwest is correct that “the [f]ederal [c]ode and accompanying regulations explicitly set
forth a ‘coordination period’ during which time the Plan would be the primary insurer” and, after the
expiration of the coordination period, “the issue of primary versus secondary coverage is resolved
by referring to the language of the Plan.” See 42 U.S.C. § 1395y(b)(1)(C); 42 CFR § 411.162.
Southwest is also correct that by 2002 Patient Doe’s coordination period had expired; consequently,
the issue of whether the Plan or Medicare was the primary payer is to be resolved by the Plan’s
language. But Southwest is incorrect in asserting that its “Plan language ... make[s] Medicare the
primary insurer for Patient Doe’s ESRD Treatment.” In support of its assertion, Southwest cites
paragraph 11 of the affidavit of Deana Combs, UMR’s corporate representative and a UMR Account
Manager. In this paragraph, Combs states as follows:
After the expiration of the “coordination period,” then the issue of coordinating
benefits between Medicare and the Plan is resolved by turning to the language
utilized by the plan. The Plan contains a section explicitly addressing coordination
of benefits with other insurers, including Medicare. Attached hereto as Exhibit 2 are
true and accurate copies of pages 67-69 of the Plan’s Summary Plan Description
(“SPD”). Pursuant to the explicit language of the Plan, after the expiration of the
“coordination period,” Medicare is the primary insurer of any claims submitted
associated with treatment for ESRD. After the “coordination period,” the Plan
would provide benefits, where applicable, only on a secondary basis. 

We have painstakingly reviewed pages 67-69 of the Plan’s Summary Plan Description and have
found only one sentence that addresses the primary versus secondary payer issue. That sentence
states: “Medicare will pay primary, secondary or last to the extent stated in federal law.” This
sentence is far from “explicit language” that “Medicare is the primary insurer of any claims
submitted associated with treatment for ESRD.” To the contrary, this sentence explicitly states that
Medicare’s status as primary or secondary payer is determined by federal law. We therefore turn to
the pertinent federal law – 42 U.S.C. § 1395y – otherwise known as the Medicare as Secondary
Payer Act or MSP. See generally, e.g., Fanning v. United States, 346 F.3d 386, 388-89 (3rd Cir.
2003), cert. denied, 124 S.Ct. 2872 (2004); Health Ins. Ass’n of Am., Inc. v. Shalala, 23 F.3d 412,
414-15 (D.C. Cir. 1994), cert. denied, 513 U.S. 1147 (1995); Blue Cross & Blue Shield of Texas, Inc.
v. Shalala, 995 F.2d 70, 73-74 (5th Cir. 1993) ; In re Dow Corning Corp., 250 B.R. 298, 335-36
(E.D. Mich. 2000) (all setting forth the history of the MSP).
            “The MSP statute was designed to curb skyrocketing health costs and preserve the fiscal
integrity of the Medicare system” “by requiring Medicare beneficiaries to exhaust all available
insurance coverage before looking to Medicare’s coverage.” Fanning, 346 F.3d at 388-89. Thus,
“[t]he MSP assigns primary responsibility for medical bills of Medicare recipients to private health
plans when a Medicare recipient is also covered by private insurance.” Id. at 389. “These private
plans are therefore considered ‘primary’ under the MSP and Medicare acts as the ‘secondary’ payer
responsible only for paying amounts not covered by the primary plan.” Id. The first way in which
this is achieved is by “bar[ring] Medicare payments where ‘payment has already been made or can
reasonably be expected to be made promptly (as determined in accordance with regulations), by a
primary plan.” Id. Section 1395y (b)(2)(A) thus provides as follows:
(A)In general Payment under this subchapter may not be made, except as
provided in subparagraph (B),


 with respect to any item or service to the extent that– 
 
(i)payment has been made, or can reasonably be expected to be
made, with respect to the item or service as required under paragraph
(1),

42 U.S.C. § 1395y(b)(2)(A). “This provision ‘is intended to keep the government from paying a
medical bill where it is clear an insurance company will pay instead.’” Fanning, 346 F.3d at 389
(quoting Evanston Hosp. v. Hauck, 1 F.3d 540, 544 (7th Cir. 1993)); see also National Ass’n of
Patients on Hemodialysis & Transplantation, Inc. v. Heckler, 588 F.Supp. 1108, 1114 (D. D.C.
1984) (“Another section of the Omnibus Budget Reconciliation Act of 1981 amended portions of
the Social Security Act to provide that Medicare benefits based solely on the ESRD program are
secondary to benefits payable under employer group health plans. The law provides that the
Secretary may not pay benefits on behalf of ESRD beneficiaries who are covered under employer
group health plans, if payment under such a plan has been made or ‘the Secretary determines will
be made ... as promptly as would otherwise be the case if payment were made by the Secretary under
this title.’” (citing 42 U.S.C. § 1395y(b)(2)(A))).
            So could Medicare reasonably expect the Plan to pay for Patient Doe’s dialysis treatments
under paragraph (1) of U.S.C. § 1395y(b)? Certainly Medicare did expect the Plan to pay as the
primary payer, as evidenced by TrailBlazer’s rejection of RenCare’s claim because “the fiscal
intermediary’s records indicate that [Patient Doe] has coverage through a large group health plan that
is primary over Medicare.” And this expectation was reasonable since the Plan fails to make
Medicare the primary payer after the expiration of the coordination period. Indeed, as RenCare points
out, the Plan in fact met its obligation to act as the primary payer for Patient Doe’s dialysis in 2003,
when Patient Doe chose a different Plan option – with the same “coordination of benefits” provision
– but a different third-party administrator. 
            In short, although the Plan was permitted by the Medicare Act to make Medicare the primary
payer for Patient Doe’s dialysis, the Plan failed to do so and instead made federal law controlling on
the issue. Since federal law plainly makes Medicare a secondary payer, the Plan – not Medicare –
was the primary payer of RenCare’s invoices.


 The trial court therefore erred in ruling to the
contrary.
Conclusion
            We hold RenCare’s tort claims do not “arise under” the Medicare Act. Consequently,
RenCare was not required to exhaust its administrative remedies (if indeed it had any); and the trial
court erred in dismissing its suit. Accordingly, we reverse the judgment and remand the cause to the
trial court for further proceedings consistent with this opinion.
 
Sarah B. Duncan, Justice